Our final case of this afternoon, and the first with this panel, is number 20-1163 EOHC v. Attorney General et al. Ms. Heller and Ms. Finkelstein. Whenever you're ready. I just wanted to make sure that I've reserved five minutes for rebuttal. That's fine. Thank you. Good afternoon, Your Honors. May it please the Court. My name is Caroline Heller from the law firm Greenberg-Trarg, representing the appellants in this matter. The appellants in this matter, Mia and her father, Mr. H., are asylum seekers, legitimate asylum seekers. The BIA in the decision found that they should be eligible to pursue their asylum claims, and that any waiver by Mr. H. had done so under duress. And the asylum hearing is, what, April 4? That is correct, Your Honor. And once this matter came to us in the interim, you've had a parole hearing with a decision on February 19, right? Well, it wasn't a hearing, Your Honor, but there was a parole decision made upon a parole application. To what extent, what's left of this case as far as you're concerned, then, in terms of trying to have a release from detention or a bond hearing? The bond hearing, I realize, technically was a court saying we didn't, the judge said he didn't have jurisdiction. Well, the whole case, we would submit, is still before the Court, because the parole determination didn't do anything to moot or otherwise eviscerate Mr. H.'s claims or Mia's. But isn't part of Mr. H.'s claim that he's entitled to have an individualized determination as to, as relevant here, risk of flight? And to the extent that the parole decision already speaks to that, hasn't he gotten that requested relief? He has not, because his assertion is that he is entitled to constitutional due process of law and that procedure. And the parole procedure does not comport with due process requirements. What's your best authority that says that, tell me the procedural safeguards you think he's entitled to, he didn't get at parole. And tell me what authority is established that he has those safeguards in a 1225B proceeding. Well, in the first instance, and we've cited some of the cases in our brief under Zedidis and Damore and other cases. He does have due process rights under the Fifth Amendment, because setting aside, we can discuss the whole arriving alien issue later. There is no dispute that he arrived on U.S. soil in California. And as such, whatever they decide to classify him as later, and I can address why we think he was misclassified. He has the same constitutional rights as anyone else in the United States. You didn't, you didn't appeal the classification decision. And one of the footnotes in your brief says that's not directly challenged before us. So we should take the classification as a given if it hasn't been preserved for us. But the classification in and of itself doesn't eviscerate the plain fact that he was in the United States. He did not arrive at a port of entry when he first came to the United States. He arrived in California. And it was only then that he and his daughter were detained. And as such, because they were on U.S. soil, they are entitled to the same constitutional protections. OK, that's also true of people in Mazzei, for example. So what case establishes a procedural? Tell me the procedures you think your client is entitled to that were not, that go above and beyond what he got in the parole hearing. And tell me what authorities say that an alien in his situation gets those procedures. Sure. So in terms of whether or not the parole procedure was appropriate, there are a few cases that talk about how parole is not procedural due process. What additional procedures is he entitled to? He is entitled to have a neutral arbiter. Is there any basis for questioning the neutrality of the decision maker in this parole procedure? Yes, there is. The neutrality of that decision maker is his jailer. It is ICE. There is, in fact, I believe, an ICE representative in the courtroom who I believe she's sitting at a police table. That is the person who is determining whether or not he is entitled to parole. It's essentially his jailer who is not neutral, who is not unbiased in this case, which is why a bond hearing is the important solution. Counsel, could you focus for a moment on, as relative to, relevant to a bond hearing, even for arriving aliens, in particular for arriving aliens who are in this situation, the regulation at 8 U.S.C. 1236.3b seems to speak to the situation that if there is a juvenile who has been ordered, released as here, that if an individual can't be accepted, can't be located to accept custody of the juvenile and the juvenile has a parent, legal guardian, or adult relative in detention, simultaneous release of the juvenile and that detained individual shall be evaluated on a discretionary case-by-case basis. The I.J. here seemed to look at the mere location of the mother as sufficient, but the regulation seems to talk about the location to accept custody of the juvenile. If the mother or no other relative or guardian is able or willing to accept custody, should this regulation be read to require, since it speaks in mandatory terms, that there be a bond hearing where an immigration judge at least takes account of that issue to make the discretionary determination about bond for the parent? We think it should, Your Honor. And in fact, because they first arrived on U.S. soil and they were not placed in expedited removal proceedings, under INA section, hold on, I believe it's 240. I just want to make sure I have that right. Yes. No. Yes. Under INA 240, they are entitled to a bond hearing. The reason that the government made the objection that it did at the bond hearing and the reason that the immigration officer found that she didn't have the authority to order bond in the case of Mr. H is because of an obstacle the government created. After being detained in Vilara for five days, during which time they were entered without inspection, they were then given a notice to appear and forcibly and illegally sent back to Mexico. Two months later, when Mr. H followed the government's instructions and went to a port of entry in order to go to his immigration hearing, it was only then that the government classified them as arriving aliens. And say, well, you entered through a port of entry. You are now an arriving alien. But that was, they would not be arriving aliens but for the government's conduct. They'd entered without inspection and they were entitled to a bond hearing. And that's all we're asking is that the government not prohibit them from receiving that. But you didn't preserve the challenge. You haven't appealed the challenge to their classification. I don't understand how this is before us if you haven't challenged that on appeal. I don't think that we need to challenge it on appeal in order for this court to still find that their last uncontested status was that they were entered without inspection and entitled to the bond hearing. Moreover, that objection to their status has been made before the BIA. So they have preserved the objection. What's important here is not the form but the substance. The substance is that they had been entitled to a bond hearing and they would have gotten it but for a government-created obstacle. Wouldn't even as an arriving alien, wouldn't even this regulation that I was referring to a moment ago apply? I believe so, but I would want to just go back and take a look. But we would contend it would apply. And here, all we're asking is for them to get what they were entitled to when they first got here. There's no question in this case that there's irreparable harm. Nobody's denying that. Each day that Mr. H and me are in detention is a violation of their constitutional rights, and each day that goes by, they are suffering irreparable harm. All we're asking here is that they get what they were entitled to when they first arrived here. Every other family in detention at Berks County who has had a reopened asylum case has had. This family is being treated differently. That's going to the First Amendment retaliation claim? It's partially the First Amendment retaliation claim, but it also demonstrates that something differently is being done with this family. The testimony of the government's representative at the hearing below, though, explained how the other seven comparators were differently situated. Don't we defer to the district court's evaluation of that testimony? Well, no. I think if you look at the testimony from our witness, she talked about other families. The testimony is not inconsistent. Their numbers are different. I believe that Mr. George talked about some families that had come after Mr. H and Mia had arrived, and Ms. Cambria talks about the totality of the families. But, you know, the other issue is that this government is trying now to separate Mia from her father. This is something that has not been done in the thousands of cases at Berks County. Not one family has ever been separated, and it's not a solution to family separation. This case has nuances where there's an offer for the mother to pick her up. Isn't that correct? Right, but it's not a solution to family separation. The violations of the constitutional liberty, interest, and family integrity to now separate her from her father. Go ahead. I just, I don't, if her mother can pick her up, although I understand the reasons why her mother doesn't want to come out and openly pick up her daughter, but the government is not doing anything intentional here. This family is making a decision as to how it wishes to go about its path to try to ultimately stay in this country, get an asylum hearing, and hopefully be successful. But, Your Honor, to suggest that to solve the constitutional deprivation would be to separate her from her father, a further family separation would be just down the street. Well, if she's separated from her father, but then she might not be separated from her mother. But she doesn't have family integrity, which is her right to be with both of her parents. So the father's going to, okay. I mean, so what's the father going to do if he gets out? He's going to go live wherever the mother is? Yes, absolutely. They'll live as a family. He has a son he's never seen before. And the family hearing, the one on April 4th, is that for the entire family? That is his asylum claim, and his daughter and his wife are derivatives on that asylum claim. So if he wins, they would benefit from it. Well, then why not wait until the asylum hearing, one way or the other? Because there's no time frame within which the judge has to make a decision. Isn't there ordinarily an oral ruling? I mean, not always, but ordinarily? No, Your Honor. I mean, well, I don't want to represent yes or no, but it's not necessary that there would be an oral ruling. There could wait for a written decision. Moreover, if they lose, they then have a right to appeal to the BIA. If they lose there, they have a right to petition for review. This process could take years, and there's no end in sight to Mr. H's and me's detention together. At this point, they are entitled to have the government justify their detention because it's become punitive. And civil immigration detention is not meant to be punitive. The government has justified it in non-punitive terms as dealing with a risk of flight, an individualized determination of risk of flight. That's a regulatory, not a punitive objective. The assertions of flight in that letter aren't flight risks. They're saying that Mr. H has done what thousands of other asylum-seeking families have done. ...to hear an appeal from an unappealable determination. You'd need to convince us that there's some legal authority for us to create a review of a non-reviewable parole determination. This Court doesn't have to determine whether or not... Actually, no, I'm answering a different question. We're not asking you to review the parole determination. Indeed, in the dozens of cases subsequent to Jennings, and there has been no Third Circuit case, but there are dozens of District of New Jersey, Middle District of Pennsylvania cases addressing whether or not arriving aliens have a right to a bond hearing at some point when their detention becomes unreasonable. In several of those cases, the non-citizens had had parole reviews that were denied. We're not asking you to review that. ICE made a determination that he's a flight risk based upon factors, none of which indicate a risk of flight. They are factors that could be indicative of thousands of asylum-seeking families. But they're discretionary factors, and it was a pretty comprehensive decision, and it would seem pretty, really quite difficult to surmount that decision. Well, in that case, then they should have a bond hearing where a neutral arbiter places the burden of proof on the government where it belongs to prove that he's a flight risk, not to have the government make its own decision about whether or not he's a risk of flight. Is the relief that's been provided to date, is that sufficient for his daughter's release? And that is, is it the case that the address and location of the mother is in fact known and she is able to take custody and choosing not to, as has been the government's representation here? The parole decision also indicates that there's a specific address at which she's known to reside. And if that's the case, and she has not yet been picked up for detention by immigration authorities, then is there really a need to consider a bond hearing for the father in order for his daughter to be released from custody? If they're to be released together, which we're asserting they're entitled to, based upon constitutional right to liberty, interest, and family integrity, then they need to have a bond hearing that addresses their detention together. I understand the argument as to family integrity for them to be released together for that purpose. But focusing just exclusively on whether there is any adult guardian parent who would be authorized to take custody of the daughter, if the father's not granted relief, given what's on the record, is there an avenue for the daughter to, in fact, be released? Or does that depend on whether there is a bond hearing for her father? At this point, that would depend on whether there's a bond hearing for her father. She has, I guess, let me rephrase that. She has the right to be released because she's been granted bond and she's been paroled. But there's the testimony at the hearing is that they need to be together for her mental health. And in addition, it's no solution to family separation to further separate a family. There's no need to re-traumatize this child. All we're asking is that the government justify its continued detention of this family at a hearing at which they have the burden of proof to show that detention is justified. I understand that argument, but I'm still not clear whether there is any adult who would be authorized to take custody who's able and willing to do so and is not currently detained. I believe that the mother would be authorized to take custody and she's not currently detained. Would the uncle? Not under these circumstances. Well, it's possible the uncle could be a sponsor, but I don't want to misrepresent anything to the court. I would have to look at what the law says to determine whether the uncle would be an appropriate sponsor. When we hear from Ms. Finkelstein, we'll get you back. Whenever you're ready. Your Honors, and may it please the court, Veronica Finkelstein on behalf of the Attorney General and other federal government defendants. Today the petitioners are asking you to recognize three broad constitutional rights in the area of immigration that have never been recognized by any court before. A right to family integrity that requires the government to release an alien who is properly detained, who has not challenged the classification by which the government's default under the INA by statute is detention. A right to due process that requires the government to override what Congress has stated in the INA that aliens of this character be detained and instead do either provide additional process beyond what is required by statute or to simply release that alien so that the alien is not detained. And a right to be free from First Amendment retaliation where it is not clear that the First Amendment even applies and where the alleged retaliation is in part based upon a negotiation by the aliens. Don't go into the right to due process. I understand they're requesting that there be a bond hearing. Here we have an immigration judge who concluded that she lacked jurisdiction and therefore did not grant any bond hearing to make a determination about release discretionary as it may be. Why isn't that something that, again, looking back to the regulation that I was identifying, why isn't that something that is in the first instance already based in existing regulation, indicating that an immigration judge shall consider simultaneous release if there's no one else able and willing to come forward, which appears to be the case since the daughter at this point is still in custody as we understand it. And then separately, you know, we can talk about 1226C. But if you could address in the first instance, why doesn't the regulation provide a path that is grounded in what Congress or the agency authorized to promulgate regulations? So let me respond in two parts, if I may. The first is, as Judge Bibas appropriately pointed out, there's been no challenge to the classification. These aliens are classified pursuant to 1225. They're not classified pursuant to another section of the INA. And the INA is quite clear by its plain language, and this court would have to do violence to that plain language. The default is detention. For aliens classified under 1225, the only process that they are due is the right to request parole, which, as Your Honors noted during the questioning of petitioners, has occurred, and they have received a substantive response from the agency. That's all the process to which they're due. The regulation is trumped by the statute, Your Honors. The INA is the controlling law. So the regulation, if you don't take it as the agency's interpretation of that statute that it is authorized to interpret, you think it's just a nullity? No, Your Honor. That's not quite what I'm arguing. The regulation doesn't trump the statute. The regulation gives a judge, when a judge is considering who a child should be bonded out to, in light of the fact that the Flores Settlement Agreement puts additional requirements in place for children that have never been held to apply to adults, when an immigration judge is interpreting who a child should go to, that regulation helps the immigration judge determine who would be an appropriate person to select as a sponsor. But that regulation predates the Flores Agreement. It predates the Flores Settlement. That's true, Your Honor. But the regulation is talking about the circumstances in which a child is going to be released. That does not mean that the regulation also provides that an alien who is detained pursuant to 1225 is suddenly entitled to that kind of determination simply because no one has come forward yet to get the child. Just mechanically, what other process would there be besides a bond hearing if, under the regulation, an immigration judge is directed to consider simultaneous release with a detained parent? Wouldn't that have to mean bond for that detained parent? Or is there some other mechanism that is available to consider the simultaneous release of the parent with that juvenile? It's a consideration for the judge, Your Honor, in deciding, once there's been a decision that the child should be bonded out, who that child should be bonded out to. But here, we've already had that determination. The mother has been identified as the person the child can be bonded to. She's not in removal proceedings. There is no reason that she cannot come and pick up the child. I understand that the family has elected not to do that, but there's no need for that regulation to come into play and for the father petitioner to also be bonded out simply because the mother won't come and pick up her child. Why isn't there a provision? I mean, that regulation suggests that an IJ should make a discretionary determination and shall consider that circumstance. And as a discretionary matter, I understand that's to the IJs and essentially unreviewable. But where there hasn't been that consideration at all by an immigration judge, why isn't that, whether we think about it in constitutional terms or just a straight-up violation of the regulation, the agency not following its regulations, why don't we have a basis there to say hold a bond hearing? You looked like you were going to ask a question. My question is, ACFR 1236.3b isn't limited to 1225, correct? There are other statutory provisions that create bond hearings. And so to the extent there is a bond hearing, the agency then needs to consider that. But am I correct in understanding unlike 1226 and 1231, 1225 doesn't have a bond hearing provision in it? Correct. And to answer both of your questions together, that is the direction for the immigration judge in the context in which bond is being considered. What are the considerations that the judge should look to? It does not direct the judge to grant a bond hearing or to have a bond hearing where the statute has quite plainly said that a bond hearing is not required. There is a bond right for juveniles, correct? Correct. That's separate. Correct. And there's a bond right for other aliens classified under other portions of the INA. And when that happens, this is a consideration for the immigration judge. But, Your Honors, here it's a discretionary determination, and there was no need for the judge to even reach that issue because the mother is present in New Jersey. She's able to pick up the child. I understand from the point of view of the family's decision-making they haven't chosen to do that. It remains on the table today. From the government's point of view, the child has received all the process to which she is due, and as has the father. How can we take that from this record that doesn't indicate what the reasoning is? You seem to be suggesting that it's a litigation strategy on the family's part, but what we have on record is simply that there's not another adult able and willing to step forward to take custody. In that circumstance, again, and I understand that you may think that there's an initial determination that needs to be made, and, again, we can talk about an as-applied challenge in 12.6c in a moment. But if an adult is not willing and able to come forward, then under the regulation, is it enough that there be an adult located who fits this description if it's not located to accept custody? Your Honor, on the record that we have, the appellate record before this court, there is no evidence that the mother is unwilling or unable to come and pick up her child. At the time we had the hearing before the district court below, the mother had not elected to come and get the child. There would be absolutely no factual basis for this court to determine that she's unable to the degree that it would require an additional bond hearing. They haven't, to my knowledge, petitioners have not challenged the fact that the mother is unable to pick up the child. To my knowledge, the mother has not to date. But as far as the record shows, the record that's before this court, to which I would suggest this court owes some deference in terms of factual findings below, as of the time we appeared before the district court, she had been bonded out, the daughter, and she had not been treated. Counselor, we have a series of cases under 12.26c. Granted, criminal alien provision, not arriving aliens, that suggest that there might be a due process right when someone's been detained in a reasonable length of time to at least one bond hearing. And your friend on the other side makes the point that a bond hearing is procedurally different. You get a live hearing. You get an IJ. When we look at cases like Diop and Chavez-Alvarez, should we be weighing whether the detention is too long now or maybe it's not too long now, but it's too long in a few months? I mean, there does seem to be some suggestion that we've looked at this in past cases. I can't pronounce the Vietnamese name, Chi Thong Ngo. So might there be a due process, procedural due process right here to a bond hearing and not just a parole hearing at some point? So as I understand it, Your Honor, what has been pled by petitioners is a procedural due process claim. There is also a line of authority that is about the substantive due process rights of a detainee. I really think that's what they're arguing, even though it's been pled as procedural due process. And what the Supreme Court has been quite clear about in Zovitis is that the test is when the detention is unreasonable. And the facts of Zovitis were not simply that it was long, but rather that there was no end in sight. You had two petitioners in Zovitis whose home countries would not take them back and the United States would not allow them to remain. And so the detention was likely to be indefinite. The same was true in Damore, where the court said six months for a lawful permanent resident is not presumptively unreasonable. The question is, is it going to be indefinite? And here we could not be further from indefinite, Your Honors. As Petitioner noted, although it's not in the appellate record, there's going to be an asylum hearing at the beginning of April. To answer Judge Bevis' question to petitioners, typically there is an oral decision, not always, but typically there is an oral decision. If there is additional appeal to the BIA, of course the agency will have to make a decision at that point. Can you give us an idea of what the median length of time is for these appeals? You can't make a promise, obviously, but we have to consider whether this detention is going to become unreasonable, perhaps, if we follow that line of reasoning. And if it becomes unreasonable at some point, the proper avenue is to challenge it in the district court, allow the district court, in the first instance, to decide the issue, and then if petitioners are dissatisfied, to appeal it to this court. And I would caution Your Honors in the due process context not to articulate a bright line rule that has never been how the Supreme Court has evaluated due process. It has always been a totality of the circumstances type test. So to say it must be six months, or even to say, well, asylum generally takes X amount of time, it should be X amount of time, is to do some violence to the way courts have always interpreted due process. Well, if we're going to take that totality approach to due process, should we really be limiting ourselves to duration or considering other circumstances, including, for example, the consequences for the mental health of the daughter? To answer in two parts, Your Honor, the first is that the district court below, which held findings of fact, heard witness testimony, and determined credibility, found that evidence unconvincing. And the second, Your Honors, is that in the totality of the circumstances approach, it should not be a bright line numeric rule. Rather, taking the teaching of the Supreme Court in Damore, in Zavidas, in the Shaughnessy case mentioned earlier, the teaching is that the question is whether it is essentially tantamount to indefinite, prolonged detention, and that's simply not the case we have here, even if the appeals take an extended period of time. The agency has discretion. That is what Congress has given it. When an alien is classified under 1225, it's for the agency to decide whether or not to parole that alien. And if the BIA process goes on for a period of time, that again will be within the discretion of the agency in the first instance. Why would that be distinguishable from the 1226C situation? I mean, Jennings, you know, was sent back to the Court of Appeals for consideration of constitutional claims. We've recognized, even since then, the cognizability of as-applied challenges. Why should it be any different? You know, there's mandatory language there for detention. Why should it be different for 1225B? And should the standard be different if it does carry over in terms of the cognizability of a claim? We would argue that you could look at the way courts have interpreted 1226C as sort of a suggestive framework. And what courts have done under 1226C is they haven't enacted a bright-line rule. They haven't said that there's a certain period of time where detention is unreasonable. That was the holding of DIOP that Jennings largely abrogated, this idea of placing a bright-line rule. Instead, what courts have said subsequently is, is it essentially tantamount to indefinite, is there no end in sight? And here you could not have a clearer end because there is a delineated process, an asylum hearing, appeal to the BIA, and at some point they will have exhausted or they will have succeeded, and that's the process, and then it will be at an end. But going back to Judge Bubas's question, there is, as provided by statute and regulation, a series of steps, a right to take appeal that can come all the way back to us. You don't want an appeal. And that can go on not just months but perhaps years. Isn't, at that point, isn't it appropriate for us to take account of the length, the potential length of detention in crossing that threshold that you're saying? Is it indefinite? And if there's no particular end in sight, doesn't that make it indefinite? I see my time is nearly at an end. If I may briefly answer your question, then it looked as though you have a question as well. We would caution the court not to reflexively look forward and make a determination as to at what point in the future some processes that may or may not have happened will result in this being essentially indefinite. That hasn't happened yet, and that should be before the district court in the first instance to make findings of fact and decide what actually has happened. To some degree, how long this process takes is outside of the government's control because it depends on what petitioners end up deciding to do, what challenges they end up bringing, whether they decide to appeal. So for this court to sit now and look forward into the future and say, if X, Y, Z happens in the future, then it will be indefinite, I think is an inappropriate thing for this court to do at this juncture. The Supreme Court is clear. You look at where the petitioner stands when he or she made his or her challenge. Here it was under six months. There was an end in sight, and that is not presumptively unreasonable as any court has held under similar facts, under any section of the statute with mandatory detention. You've indicated that we don't need to consider the mental health consequences for the daughter based on the district court's findings. But here there were three experts, including the government's. The district court set all of those aside and instead offered its own medical opinion that there were no mental health issues for the daughter and proceeded to make also a number of statements in the record that suggested, or at least could be read, as indicating that anyone who enters with a plan with their own family to come to the United States illegally has unclean hands, and particularly if they do so while pregnant. To the extent the district court's findings and determinations there go contrary to the evidence in the record or suggest or might be read to incorporate considerations outside of what might be anticipated for a district court to weigh in the mix, is it really sufficient for us to say because of those findings of the district court that there was no mental health issue that we should not factor that in the mix given what actually appears in this record? So if I may answer in two parts. The first is that petitioners had the burden of proof before the district court. They were coming to the court asking for an extraordinary form of relief, preliminary injunctive relief on a very short time period. The default assumption is that everything is the status quo unless they can convince the trier of fact who here was the district court otherwise. So the status quo is that there is no evidence of mental health impacts. They presented two experts. They were allowed to present all the evidence they wanted to present in contravention of the rules of civil procedure and the rules of evidence, and the district court judge allowed all of that testimony, considered all of it, and didn't credit it. He also didn't credit the representative of Berks, who is not a government employee but who works in the Berks facility, who also presented evidence that he didn't see any mental health impacts in the child. So in the absence of evidence to move the needle, the party with the burden of proof hasn't moved it, and so the default is that there was no credible evidence of mental health impacts, and he was entitled to credit that. The second and more important point is that I'm not sure that it matters because the constitutional rights that are being claimed here, no court has ever recognized. There's not one case in any of these briefs, not one, where because the child had the right to be released, the parent had to be released as well. There's not one. There's cases where the child is returned to detention to be with the parent. That's where she is. She has the choice to go with her mother. She has the choice to remain with her father. No one has ever tried to forcibly separate her. That's where we are. There is no case that stands for the proposition that when you come to the country as a clandestine alien and you're classified under the INA, under a section of the INA for which detention is mandatory and there is only the most narrow exception in the discretion of the government, that you have a due process right after only less than six months to require the government to detain you or that you have the right to a bond hearing when the statute plainly says you're not entitled to it. And there's no constitutional First Amendment right that would color the instant facts in this case as retaliation, where as petitioners routinely fail to emphasize, they requested to be detained. I understand it was not their ideal situation, but faced with return to Mexico or being able to remain in Berks, they requested to remain in Berks. And that fact colors so much of why they remained in Berks. So didn't they do that with expressly indicating they were not waiving their right to appeal the issues of bond and release? I would not personally characterize the facts as that they clearly reserved that right. It was not discussed. But even if they had reserved that right, nobody has prevented them from challenging it. But it nonetheless plays into the district court's analysis and its proper conclusion that the reason that they remained in Berks was at least in part motivated by the fact that they had created a unique situation. They had intentionally separated the family when they came to the border. Should we be concerned that the district court's suggestion that anyone who enters the United States and makes a plan to do so with their family entering illegally then has unclean hands? And to the extent that may have colored other considerations, is that something that should concern us for purposes of this appeal? So first of all, it's not outcome determinative because if there's no likelihood of success on the merits, the balancing of the equities doesn't really matter. But to the extent that your honors think that it is determinative, the district court below was not just relying on the fact that petitioners came to the country. I understand that that is how petitioners characterize it, but those were not all the facts that the district court judge had below that he was considering. He was considering the fact that the father here entered illegally in 2014, was removed, was barred from returning, came back to the country anyway. That shows an inability or an unwillingness to comply with immigration law. He considered the fact that the family did not disclose the mother's presence in a meaningful or helpful way at the first instance in which they understood from their point of view that the child was experiencing mental health impacts. You would expect that a family that was not attempting to, to some degree, take advantage of the system, the moment that they felt the child was at risk would have immediately come forward and said, the mother is here, she's in New Jersey, what can we do to facilitate release of the child to the mother? And he considered the fact that even once the mother was identified and the agency agreed to release the child, didn't oppose bond, said the child can go at any time, all the mother has to do is come and pick her up, we'll take measures to facilitate that, that the family still chose to keep the child with the father while at the same time challenging the conditions under which she was kept. So the district court below had this complete evidence of record, and that's one of the many reasons why the district courts should be entitled to deference in its determination of the facts, its findings on credibility, and the inferences it drew. Because it had so much more than your honors have on a cold record. It got to see all of the witnesses sit in the witness chair and it got to decide what it believed and what it didn't believe, and there was evidence beyond just the fact that this family came to the United States. Is the determination of unclean hands really an appropriate one for a district court to use? Even with the facts you described, does that support a finding of unclean hands as an equitable matter, which would in turn support denial of relief for it seems like a great number of aliens who were seeking relief? Well, it wasn't the entire reason that the district court below denied relief. The district court also worked through each of the claims and found that there was no likelihood of success on the merits. The district court balanced the equities and determined that of the four factors that petitioners had the burden to prove in order to be entitled to an injunction, they could only prove one. And the court also determined that there was unclean hands. So I would argue that there are many paths to roam here and that it almost doesn't matter that the district court made that finding. But frankly, Your Honor, the district court was the one hearing the evidence and the district court heard all of that evidence and drew its conclusion. And it is not the role of a reviewing circuit court to ask itself, if I was the district court judge, what would I have done? The standard of review is, could any is there any way to say that this finding was reasonable under the facts and not to substitute your own judgment? And on clear error review, there's very we get that. Thank you, Your Honor. But the but the if the mother were to show up. Are there any consequences for her if she shows up to pick up her daughter? She's not in removal proceeding in the entirety of this case. She hasn't been placed in removal proceeding. You're correct. Her address is known. She still hasn't been served with anything. She's still not put in removal proceedings. I understand her to be derivative of the father's asylum claim. And it was this is not in the appellate record. But it has been offered many times by the government that if she's willing to come and get the child, we will do whatever it takes to facilitate it. And she shouldn't have any fear of coming to pick up the child. It's the family's decision. They've they've elected not to go that route. But that has has been and remains on the table. Thank you. Thank you. It's evident from what you just heard that the mother is unable or unwilling to come pick up the child. So it sounds like she's unwilling, I mean, unwilling to come pick up the child. And the reason she's unwilling is because no one, not one mental health professional have ever supported the mother in any way.  And setting aside what the district court found, who is credible, who is not credible. Mr. Moscow wasn't even allowed to answer that question when it was asked from him of direct. Do you support separation of Mr. H and Mia? And you can just use your common sense here. You don't need to have a mental health expert to suggest that separating a daughter from her father, who she's been the sole caretaker for the past very traumatic 10 months, is a bad idea, a terrible idea for her. But she's feeling compelled now to make a choice between leaving detention and being with her mother and baby brother or being separated from her loving father. But this is temporary. Why not just show up, pick her up for the purpose of getting her out of this Berks County facility? And the father will attempt to do what he can to get released if he can. If not, then we're going forward with the asylum hearing. We're going forward with a possible appeal to the BIA. And then we're going forward with a possible petition for review to us. Because, again, the solution to one separation is not to do another separation. There is lots of literature. Either way, you've got a separation. Well, we're hoping that the result of this case would be that there would be a meaningful review to provide this family process to determine whether that separation would be justified. But I think Ms. Finkelstein was correct that you haven't cited a single case that was, you know, leveraged one parent and a child out of custody in order to go to another parent. So you're asking us to be the first court to hold that. No. Have you cited a case? Well, the district. They're a case. No, because this doesn't happen. It doesn't happen that a parent. You're asking us to reach an unprecedented holding. We're not, though. And this is why. The district court conflated the issue of family integrity and release. We're not saying that what our argument is that there is a constitutional deprivation here of the liberty interest in family integrity. And that the remedy we're asking for in the interim is a bond hearing where the government bears the burden. We're not suggesting that the two issues were being conflated by the district court. The decision of the November-December with respect to the bond, and there was a hearing, and the judge said there's no jurisdiction, but that's on appeal to the BIA, right? Correct. So why don't we let that process play out? Because we don't have any timeframe during which the BIA will make its decision. And if the BIA finds against the father, then he's in indefinite detention. And to go to the separate point, this court can still find that the district court erred in finding that Mr. H did not have a likelihood of success on the merits on his procedural due process claim with regard to his freedom. And this court got to that question a little bit with Ms. Finkelstein. When you have cases that have 1226C. Those are all cases, at least all the ones in the last 20 years, where the person had some status in this country and was on that side of the line. But Mazzei and Zedvitas understood Mazzei this way, say that your client's on the other side of the line as someone who gets whatever process is guaranteed by statute, and that's it. So that's a lot to leverage the 1226C cases over to 1225B. Well, two answers to that, Your Honor. The first is that setting aside whether the reclassification of them as arriving aliens was appropriate, no one disputes that they were on U.S. soil when they were detained. So was Mazzei. In which case? Shaughnessy versus the United States ex-rail Mazzei, which Zedvitas reaffirmed. It did not reject it, just distinguished it, saying those are on the arriving alien side of the line. Zedvitas, Castro, these other cases are on the people who've been in the country and started to develop connections, you know, in some kind of status. Well, Mazzei was a little bit different. I mean, that was during the Cold War, and the person was found to be a national security threat. But Zedvitas did not distinguish it on that ground. Zedvitas said, still notionally at the border. That's the ground on which Zedvitas set it aside. That's right. In Mazzei, the person had been excluded, was on Ellis Island, was trying to find a country that would take him. No country would take him. That is not this case. Mr. H and Mia came across the border. They were on U.S. soil. And the case law says that they are entitled to certain due process rights as a result. As a result of being asylum seekers, right? Well, the fact that they're asylum seekers certainly augments that. But they stepped on U.S. soil. This is not a situation where they were detained outside of U.S. jurisdiction. Merely illegally entering the country does not, you know, if someone gets caught 100 miles inside the border, the cases still treat that person as notionally at the border. The cases you're talking about are ones where the person was in some kind of status, got withholding or removal, was a lawful permanent resident. You know, that's the notional line that Landon v. Placencia and Mazzei recognized. Well, even for the individuals who are within that 100-mile jurisdiction, many of them are entitled to bond hearings. But the other thing to remember is that in the dozen, and there has not been a circuit case, Your Honor, but in the dozens of cases that have followed Jennings that have addressed the rights of 1225B noncitizens, whether their detention is unreasonable, have found that you essentially evaluate it by the same factors. Punjani didn't. Punjani followed Mazzei. Punjani is a little bit of an outlier. And if I had more time, I would distinguish it for you because I have to find it in my notes. But there are dozens of cases in the Middle District of Pennsylvania and in the District of New Jersey. Here, the detention is unreasonable because he and his daughter were entitled to a bond hearing the first few days that they had stepped foot on U.S. soil and they were being detained in the Alara. You have a number of district court cases on your side, but we also have the First Circuit in Aguilar, the Fourth in Reyna, where we had an alien parent detained, the child not, and the courts were unwilling to recognize a liberty interest there. Are you asking us to create a circuit split with those, or are those distinguishable? No, because, in fact, in Aguilar, and I'm probably mispronouncing it, so I apologize, that court talks about how it's a very fact-specific evaluation to determine if there is a liberty interest in family integrity. In that case, there was a very limited detention of some parents, and the assertion in that case was that they had an interest in family integrity to communicate with their families to let them know where they were. It was not about them needing to be together. The petition for habeas, I think, was brought within two days after the arrests. Further, the court found that because 30 of the families had been unified for humanitarian reasons, that that also undercut the petitioner's argument in that case. I think Aguilar does talk about there could be circumstances in which there is a liberty interest in family integrity, and you have to look at it on a case-by-case basis. And in Aguilar, the assertions were a little bit different, and so were the status of the parents and the children. Further, if you look at the Mizell case, it talks also about the fact that you have to look fact-specifically at a case to determine whether there's a liberty interest in family integrity. It almost sounds like what Ms. Finkelstein said may be correct, that the daughter wants to be released, or people are trying to get her released, and there's family integrity, and therefore the father tags along because of family integrity, despite the fact that the mother has been offered the opportunity to pick her up purportedly without consequences. No, Your Honor, we're not saying that the father should happily skip out and that's it, and that we're done. What we're saying is that because Mr. H. and Mia have a reciprocal interest in the liberty and interest in family integrity, they have a right to a meaningful review of that before that liberty interest is encroached upon. Right now it's being encroached upon, and there's been no meaningful review of their detention together. Well, you've got an asylum hearing coming up, you've got an appeal to the BIA with respect to the bond hearing, and you've got a February 19 denial of parole. I mean, it looks like they're getting, maybe not as fast as they want, obviously, a due process here. But they're not, Your Honor, because they're detained together until there's a disposition in some of those cases, and it's unknown what that timeframe is. My point is, in reality, they don't have to be detained together. The daughter can be released probably tomorrow. But that encroaches on her liberty, interest, and family integrity. Back to my point, isn't what you're really saying is that there's a family integrity interest, somehow a substitute process interest that's in play here that the father gets to tag along if the daughter's released? No, there has to be a meaningful review of that detention together. If, at the end of the day, an immigration judge decides that there are reasons why Mr. H should not be released, such as that he's a flight risk if the government approves that, then the family's left with that. But they're entitled, at least, to that review. What principle limit would there be if there is that interest recognized as a basis for a bond hearing? That's to say, whether it's in the immigration context or criminal context or even military conscription context, if a parent is going to be removed, does that give rise to a due process claim based on family integrity? Not necessarily. It's a fact-specific inquiry. For example, somebody who's incarcerated, and there have been cases where incarcerated individuals have sought to have certain rights vis-a-vis their children, to see their children, et cetera, based upon liberty, interest, and family integrity. But in that case, there was a process in place whereby somebody is convicted and sentenced to prison for a certain amount of time. Here, we're just asking for process to review their detention together. This court in Guerrero-Sanchez talked about how detaining him without a bond hearing while he pursued his bona fide withholding-only claim would effectively punish him for doing that. But time out. Why not process for retaining them separately, especially if the daughter can be released tomorrow? Because her liberty, interest, and family integrity is being encroached upon, because she's being forced to decide which parent to be with. She loses one parent either way. She loses that family unit. But it isn't the mother is not a bad person that you don't want her with the mother, correct? I don't think there's ever been an allegation that either parent is anything but loving. Okay. And so if the opportunity for the mother, I'm just talking about the realities here. If the mother can pick her up tomorrow, and we're being told by Ms. Finkelstein, without consequences, then why not avail yourself of that opportunity and then fight with respect to the bond, et cetera, pertaining to the father? You've gotten, in terms of this family, it isn't that she's going with somebody who's not a family member. She's not even going with her uncle. She's going with her own mother. I'm missing something. Your Honor, just talking plain common sense, or not common sense, because Mia has been with her father for a harrowing ten months. They were in Mexico under some very scary circumstances. They have been in Berks County. She has seen every single one of her friends leave. Her father is the one foundation she has had during that entire time. Plus, we're talking about a child from six to seven. The development during that period alone is significant, and she is bonded with her father. To separate them would re-traumatize her. There's some testimony of that, but there may be other testimony that it isn't that so significant that she can't be separated. Well, given that her mother seems unwilling to pick her up, the family must consider it pretty significant that she needs to be with her father for her own sake. So important that they're together that they would be willing to leave her in a detention facility. Or being advised that that's the best opportunity for the father to get out if he can tag along with her. I'm taking a guess on a supposition. Let me finish up with the classification issue that Judge Bibas brought up. My understanding is that you challenged classification as arriving aliens before the district court. Is that correct? No, not before the district court in this case. There's a challenge on appeal to the BIA with respect to the bond determination. But you haven't challenged it before us. It wasn't raised as an issue at the district court because, quite frankly, this court doesn't need to decide whether that classification is appropriate or not. Or the reclassification, which was made in June of 2019, to determine that in April, when they first stepped foot on U.S. soil, they entered without inspection and therefore would have been entitled to a bond hearing. The government currently classifies them as what? Arriving aliens under what? B1? Yes, that's right. They're currently classified as arriving aliens on B1. And that determination was made on June 25th. If you look at their initial notice to admit. Sorry, not notice to admit. If you look at their initial notice to appear, which is dated, I think, April 28th. That does not designate them as arriving aliens. That box is not checked. And I believe that that is at Appendix 834. That should be the notice to appear. They were not designated arriving aliens until they returned, followed instructions and appeared at a court of entry and reclassified in June. And I think it's Appendix 1226. I can double check that. So for two months, they're not classified as arriving aliens. They entered without inspection. They were entitled to a bond hearing. But this court doesn't need to reach whether that reclassification was correct or not. Because the case law following Jennings, if we're just talking about unreasonable detention, has found that for both 1225B and 1226C, you judge reasonableness in the same fashion because there are base constitutional rights that even arriving aliens have. Liberty interest under the Fifth Amendment is so fundamental that the district courts subsequent to Jennings have found that 1225B non-citizens have a right not to be detained for an unreasonable period of time. In this case, it was unreasonable to detain Mr. H without a bond hearing as of the day that he arrived here with Mia. And it is unreasonable now. They've been detained for a significant period of time. But it's not just the time that you look at. It's the circumstances. He is an asylum seeker. His asylum claim was reopened after the B.I. did something it rarely does, finding that he had been tricked and was under duress as a result of information he got from somebody at the border and reopened his asylum. It was reopened. So he's now having the asylum hearing coming up. And whether he gets asylum or not, if he doesn't, determination of whether that decision is correct could be years. So you suggested that they are treated being treated differently and it's retaliatory. But all we have are general allegations that this is different than other families from from from counsel. Sure. Why? Why isn't there more anything specific in the record if that is the case? And how could we reverse absolutely anything in the record? Well, I think that the testimony is very specific in the record. The testimony is from an attorney who testified in this. She was not challenged on any of this, that the nonprofit that she runs is the only nonprofit that is in Berks County interviewing the detainees. And she has worked with up to a thousand families. And in her experience, every family who has had a reopened asylum claim has either been paroled or gotten a bond hearing. Her testimony was not challenged on those facts. And the facts are very specific. If you look in the record as to what she talks about and how this family is being treated differently than other families in Berks County. I just wanted to confirm, is it the case that the government has represented to you before today that the mother stepped forward, that it has given its assurance that no adverse action would be taken against her in terms of the initiation of removal proceedings? I don't recall such representation, but I wouldn't want to say flat out it hadn't been made. I just don't recall that being made. It doesn't ring a bell. The government witnesses testified. This is the only family at Berks where there's ever been an attempt to separate a parent from a child. He couldn't remember any other family. This had happened to your honor. We're simply asking that this family have something that they were entitled to when they crossed the border, which is a meaningful review of their detention together. Small ask. It's something that asylum seekers get every day. At the end of the day, a neutral arbiter determines that Mr. H is a flight risk. That will be the decision. But we're just asking for a mutual review. Thank you very much. Are you handling this case pro bono? Yes, your honor. Very well done. Very well. Very well argued by both counsel. Really extremely well argued. I'd like to ask that a transcript be prepared of this oral argument. And I would ask the government if you if you would pick up the cost for that. And could we see counsel up here? We could please. Michael, if you can turn it. Is that off, Michael? That's not. Testing one, two. Testing one, two, three. Testing one, two, three. Testing one, two, three. Testing one, two, three. Testing one, two, three. Testing one, two, three.  Testing one, two, three.  Testing one, two, three.  Testing one, two, three. Testing one, two, three.